[S. F. No. 19502. In Bank. Sept. 20, 1957.]

Estate of JANE L. STANFORD, Deceased. BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY et al., Appellants, v. AIMEE G. REYNOLDS et al., Respondents.

James D. Adams, Albert J. Moorman, McCutcheon, Thomas, Matthew, Griffiths & Greene, Dudley Robinson, Caryl Warner, Warner & Sutton and Barbara Warner for Appellants.

John L. Bradley, Sam J. Whiting, Jr., Crimmins, Kent, Draper & Bradley, Schwartz & Alschuler and Leon S. Alschuler for Respondents.

CARTER, J.—These are appeals from a decree settling the final account and distributing the property of the estate of Jane Stanford who died testate in 1905.

By her will, dated July 28, 1903, decedent bequeathed $2,000,000 in trust to the Union Trust Company (now Wells

Fargo Bank) as trustee, as follows: (1) The net income of one-half thereof to be paid her brother Ariel Lathrop during his life. The trust was to cease upon his death and the corpus thereof was to belong to and be delivered to his named relatives. (2) To pay to her niece, Jennie Lawton, the net income from one-third of the other half for her lifetime and "upon her death [the] trust shall cease" and one-third of the corpus "shall belong and be delivered to the child or children of" Jennie. (3) The same provision was made as to her niece, Amy Hansen, as to one-third of the half. (4) The net income from the remaining one-third was to be paid to Daniel and Amy Gunning, children of decedent's deceased niece, Christine Gunning, until they reached a certain age when the corpus was to go to them, but if either died before attaining the specified age, then to the children of the one dying. Thereafter gifts were made to various persons. The residue was bequeathed to Stanford University and provision was made for $100 to any contestant who attempted to impair, invalidate or set aside the will and any amount such contestant would have received, except for the contest, was to go to Stanford University, the residuary legatee.

Probate proceedings were commenced and on April 6, 1906, a decree of partial distribution was rendered ordering "that there be distributed to the respective legatees . . . upon their respective legacies the following respective amounts, namely: To the Union Trust Company [the trustee named in the will] $1,900,000 in trust and upon the trusts provided for by" her will "said trusts being expressed in said will as follows." Then followed the exact wording of the will above mentioned. On May 1, 1908, the court decreed the settlement of the third and final account and ordered final distribution. The decree recited that all legatees had been paid their legacies in full, with the exception of Stanford University, and ordered all the rest and remainder of the estate known or unknown to be delivered to Stanford University.

Jennie Lawton ((2) above) had one child, Daniel, who died in 1926, before the death of his mother, bequeathing his interest in the estate to his mother, Jennie. Shortly thereafter Jennie died and on October 7, 1927, the court decreed that on Jennie's death the trust had ended and ordered that the corpus of the trust be delivered to Jennie's executor, stating that in its "opinion" the interest of Daniel "vested" upon the death of the testatrix. Stanford University ap-

pealed but the appeal was dismissed on stipulation. Amy Hansen ((3) above) had one natural child, Walter, who died in 1918 before his mother, bequeathing his estate to Ruth Barton. In 1924, Amy Hansen adopted as her children, by proceedings in a New York court, Aimee Gunning Reynolds, an adult, and her two children, Aimee Rochester, now Muniz, and Minnie Rochester. Amy Hansen died in 1954, leaving surviving her the persons she had adopted.

The court decreed that all the remaining corpus of the trust be distributed to the adopted persons, Aimee Reynolds, Minnie Rochester and Aimee Muniz, finding that the trust as to (1), (2) and (4) had terminated and the remainder interests had been distributed; that Ruth Barton, the successor of Walter, the son of Amy Hansen, should receive nothing as Walter had predeceased his mother. Ruth Barton and Stanford University appeal.

Ruth Barton contends that the interest of Walter passed to her although he predeceased his mother, Amy Hansen, the life tenant of the property, because the remainder was vested when the testatrix, Jane Stanford, died; that the decrees in 1906 and 1908 distributing the property so construed the testatrix' will; that the 1927 decree with respect to Jennie Lawton, which determined that the interest of the remainderman, Daniel, passed to his legatee, Jennie, although he died before the life tenant, Jennie, is res judicata as to Stanford University.

Thus the main question presented is whether the remainder to Walter was vested as to title in him at the death of the testatrix with the right of possession postponed, or, stated another way, whether Walter's survival of the life tenant, his mother, was a contingency upon which depended his or his successor's interest as remaindermen.

In construing the language of a bequest, such as we have here, the primary common law rule in favor of early vesting of title in remaindermen and the preference for vested rather than contingent remainders is firmly established in this state. (*Williams* v. *Williams,* 73 Cal. 99 [14 P. 394]; *Estate of Rider,* 199 Cal. 742 [251 P. 805]; *In re Shoemake,* 211 Cal. 457 [295 P. 830]; *Estate of Ritzman,* 186 Cal. 567 [199 P. 783]; *Estate of Riemer,* 69 Cal.App.2d 634 [159 P.2d 677]; *Estate of Norris,* 78 Cal.App.2d 152 [177 P.2d 299]; *Estate of Whitney,* 176 Cal. 12 [169 P. 399]; *Estate of Lawrence,* 17 Cal.2d 1 [108 P.2d 893]; *Victory Oil Co.* v. *Hancock Oil Co.,* 125 Cal.App.2d 222 [270 P.2d 604]; Rest., Property,

§ 243; Simes and Smith, The Law of Future Interests, § 573.) This rule is given recognition in section 28 of the Probate Code which provides: ''Testamentary dispositions, including devises and bequests to a person on attaining majority, are presumed to vest at the testator's death.'' Section 123 provides in part: ''A testamentary disposition to a class includes every person answering the description at the testator's death; but when the possession is postponed to a future period, it includes also all persons coming within the description before the time to which possession is postponed.'' And it has been said by noted authors on the subject, with the citation of numerous authorities, that: ''A remainder limited without words of condition to a class of persons, such as 'children,' one or more of whom is in existence and ascertained, is vested, though subject to be divested in part by the coming into existence or ascertainment of other members of the class. This is the typical vested remainder subject to open. Thus, if land is devised to A for life, remainder to the children of A, the remainder vests in the children as soon as they are in existence, although the other children born to A will eventually participate in the enjoyment of the estate. *Usually this issue is involved when one of the children of A has died before his ancestor, and the question to be decided is whether the heirs of the deceased child take a share in the remainder or whether it all passes to those children who survive A.* If there were a condition precedent of survival to the time of distribution, then the heirs of the deceased child could not take. The conclusion that the remainder is vested, and not subject to any condition precedent, is regarded as being based upon the theory that there is a person in being to whom the seisin could pass. While the interests of the unborn or unascertained persons can hardly be spoken of as vested in any possible sense of the word, the remainder is said to be vested, since the interest of the ascertained person may be regarded as vested. This proposition can be stated in another way: the mere fact that the entire membership of the class cannot be determined until some later time when the interest becomes possessory does not mean that there is a condition precedent that the existing members of the class must survive until that time in order to partake of present ownership. *Only rarely does a court reach a contrary result.*'' (Emphasis added; Simes and Smith, The Law of Future Interests (1956), § 146; see Rest., Property, §§ 256, 257, 260.) And: ''. . . the cases indicate

clearly that the mere fact that takers of a postponed gift are described by a class designation such as children, grandchildren, nieces, nephews, and the like, does not give rise to any implied condition of survival. In other words, a gift of a future interest to a class may be vested in interest even though possession and enjoyment are postponed. The whole concept of a remainder vested subject to open is based upon such a view, and the overwhelming weight of authority is to the effect that gifts to a class, without any words of condition, are vested when there is some member of the class in being." (*Id.,* § 578.) ■ And further: "An examination of the decisions indicates the following conclusions: First, if a testator expressly provides that a class gift is to vest prior to the time when the class closes, his intent will be effectuated. ■ Second, as to devises of land, there is no presumption that, in a gift to a class where distribution is postponed, there is a condition precedent that the members of the class must survive the period of distribution; as to bequests, at least in some jurisdictions, courts may occasionally imply a condition precedent of survivorship in the case of a gift to a class with distribution postponed to a future time where they would not do so in the case of a gift to named persons.

"It is to be noted that the rules of construction which separate the problem of vesting of class gifts and the problem of the closing of classes are not mere technical doctrines derived from lifeless concepts of property law. The court, in a very real way, is effectuating what the normal testator would desire. Consider the typical case where a testator leaves his residuary estate to his son A for life, remainder to A's children. Suppose A has two children at the testator's death. One of them dies before A, and two more children are born. In many instances the testator has not contemplated these changes in circumstances. Yet, had he done so, he probably would have wished to include in the class all those children living at his own death plus all those subsequently born. If we regard the time of vesting of the class and the time of its closing as one and the same, this wish cannot be effectuated. The children, as of the testator's death, are but two. The children, as of the time of A's death, are three. But, if we apply the rule that the remainder vests in the two living at the testator's death, subject to open and let in after-born children, we let in all four children. All *stirpes* are represented." (*Id.,* § 654.) In *In re Shoemake,* 211 Cal. 457, 460 [295 P. 830], the court was considering whether the

successors of the life tenant's daughter, who died before the life tenant, would take where, under a deed, the remainder was to the heirs of the life tenant, the court saying in the course of discussion: "At that time Lela Barnett [the daughter] was living and could have been specially mentioned; she was not. *She might have been clearly identified as the holder of a vested remainder by the use of the term 'children' without other language, but was not.* What could the grantor have had in mind? Certainly not the intention to provide for Lela Barnett in particular, but in general for his descendents, including Lela Barnett. The intention to have his property go to persons in his own line of descent seems plain. *If, however, a vested remainder came to Lela Barnett,* it was possible for her *prior to her actual possession of the property* [emphasis that of the court] to alien her future interests, so that it might go to strangers." (Emphasis added.) In *Estate of Backesto,* 71 Cal.App. 409 [235 P. 670] the testator's will bequeathed a life estate to his wife and "after her death, the property shall be sold, and the proceeds shall be equally divided" between "the children" of certain brothers and sisters of the testator and his wife. A child of one of the brothers died before the wife who was the life tenant. The court held that the successor of the child dying before the life tenant took the child's share, stating at page 416: "All these sections [various sections of the Civil Code*] show the unmistakable intention of the statutory law to declare that a devise or bequest shall vest at the testator's death unless some other intention is expressed in the will. This policy has been recognized and approved by the California decisions. (*Williams* v. *Williams,* 73 Cal. 99, 102 [14 P. 394]; *In re De Vries,* 17 Cal.App. 184, 190 [119 P. 109]; *Miller* v. *Oliver,* 54 Cal.App. 495, 498 [202 P. 168]; *Estate of Campbell,* 149 Cal. 712, 717 [87 P. 573].) The same rule is approved in 23 R.C.L., pp. 530, 535, *Doe etc.* v. *Considine,* 6 Wall. (73 U.S.) 458, 475 [18 L.Ed. 469, see also Rose's U.S. Notes], and *McArthur* v. *Scott,* 113 U.S. 340, 378 [28 L.Ed. 1015, 5 S.Ct. 652]; 24 Am. & Eng. Ency. of Law, 2d ed., p. 382; and numerous other authorities which we deem it unnecessary to cite. It is accepted as a settled principle by such text-writers as 2 Jarman on Wills, p. 841; 2 Williams on Executors, 7th ed., p. 1344, Alexander on Wills, § 996, Minor on Real Property, § 749, and Tiedeman on Real Property, § 302.

---

\* Including the text now in Probate Code, section 123, *supra.*

It has thus become a fixed policy in the interpretation of clauses of this nature found in a will that a disposition to a class includes every person answering the description at the testator's death and that the estate vests in them as they come *in esse* though the possession is postponed to a future period." In *Keating* v. *Smith*, 154 Cal. 186 [97 P. 300], the decree of distribution provided that on the termination of a trust, the duration of which was measured by the minority of the children, the corpus was "to go" to the testator's widow. The court held that the widow possessed an interest, which was not contingent upon her survivorship until the termination of the trust, and she, having died before that time, nevertheless had an interest during the life of the trust which passed to her heirs or devisees. In *Estate of Wallace*, 11 Cal.2d 338 [79 P.2d 1094], the decree of distribution distributed the property in trust with directions to pay the testator's widow a specified periodic sum out of the income, and also directed that two named children receive the balance of the income, and upon the death of the life tenant-widow the trust was to terminate and the trustee "shall distribute the balance" of the trust property to the two children. One of the children predeceased the widow but the court held that her share passed to her heirs as a vested remainder, reasoning that the words "shall distribute" (the direction to the trustee) referred to the distribution or delivery of the *possession* of the property rather than creating a contingency of survivorship or the passage of title. In *Estate of Norris*, 78 Cal.App. 2d 152 [177 P.2d 299], the will set up a trust and provided that the trust should end on the death of named persons and "thereupon and at once the . . . trustee shall grant and deliver" the corpus to the "children" of Frederic and Edith, the testator's son and wife. One of the children died before the life tenants. The decree of distribution was somewhat differently phrased. The court held that the deceased son's heirs or devisees took his interest, stating at page 161: "The law is well settled that vested remainders can be created in a class the membership of which is not complete at the effective date of the grant or devise, so that similar vested interests accrue to those who, by later entry therein, fall within the class. Thus, in the present case, even if the 'after-born' clause referred to the remainders as well as to the trust (the trial court found it referred only to the trust), that factor would not indicate that the remainders were contingent. In such a case the remainders could well be vested in the three

children of Frederic and Edith, and, had there been any later entrants into the class (there were not), their interests would have vested as they were born, and by virtue of the consequent increase in the class membership, the vested interests of the preceding members would have been proportionately diminished. It is well settled that the fact that the interests of existing members of the class may be thus diminished does not convert the interest of such members to contingent remainders. In such event the remainders are vested subject to a condition subsequent. This is the rule of the Restatement. In 2 Restatement of the Law of Property, section 157, it is provided that: 'A remainder can be (a) indefeasibly vested; or (b) vested subject to open. . . .' As an illustration of clause (b) the Restatement states: 'A, owning Blackacre in fee simple absolute, transfers Blackacre "to B for life, remainder to the children of B." B has a child C. C has a remainder vested subject to open and let in other children born to B.' " (See also to the same import, *Estate of Welch,* 83 Cal.App.2d 391 [188 P.2d 797]; *Estate of Newman,* 68 Cal.App. 420 [229 P. 898]; *Estate of Klein,* 23 Cal.App.2d 708 [74 P.2d 79]; *Estate of Riemer,* 69 Cal.App.2d 634 [159 P.2d 677].) ██ *Estate of Cavarly,* 119 Cal. 406 [51 P. 629], apparently is to the contrary on its assumption that a gift of a future interest to a class was dependent on survival but it misconstrued the authority cited therefor (see 40 Cal. L.Rev. 58-59) and failed to apply a portion of the provisions of section 1337 of the Civil Code, now section 123 of the Probate Code, *supra.* The same is true of *Estate of Clark,* 64 Cal.App.2d 636 [149 P.2d 465]. Those cases (Cavarly and Clark) and such cases as *Estate of Blake,* 157 Cal. 448 [108 P. 287], and *Estate of Hamon,* 136 Cal.App. 517 [29 P.2d 326], are disapproved insofar as the question herein decided is concerned. *Anglo California Nat. Bank* v. *Kidd,* 58 Cal.App.2d 651 [137 P.2d 460], and *In re Rogers,* 94 Cal. 526 [29 P. 962], may be distinguished on the basis of the language in the instrument construed. *Estate of Hartson,* 218 Cal. 536 [24 P.2d 171], and *In re Winter,* 114 Cal. 186 [45 P. 1063], did not apply the erroneous rule of *Estate of Cavarly, supra,* 119 Cal. 406, that in case of class gifts there is a condition of survivorship and may also be distinguished on the basis of the language used in the instruments construed.

██ The words of the will directing that on Mrs. Hansen's death the trust should cease is nothing more than a way of

saying that the trust is for her life. While the words thereafter directing that the corpus shall "belong" to and "be delivered" to the life tenant's children, the remaindermen, may encompass ownership in other situations (see, for example, *Hackett* v. *California Laundry*, 7 Cal.App.2d Supp. 757 [45 P.2d 833]; *San Francisco* v. *McGovern*, 28 Cal.App. 491 [152 P. 980]; *State Land Settlement Board* v. *Henderson*, 197 Cal. 470 [241 P. 560]; 10 C.J.S. 241), they are not technical terms but are ones which are common in everyday usage and may refer to possession only. Certainly that construction is reasonable, leaving the rule of early vesting applicable. This serves to distinguish *Estate of Easter*, 24 Cal.2d 191 [148 P.2d 601]. In that case, the term to be construed was the technical word "vest," and the clause in which it was contained did not appear in the will but had been added by the probate court in its distribution decree. It was, therefore, concluded that the word "vest" did not give rise to the application of the early vesting rule, but referred to ownership. The situations in the present case and in the Easter case are thus different. The direction for delivery is an instruction to the trustee of the trust. ■ The expression "belong to" adds nothing to the phrase "go to" such as in a devise to A for life and the remainder to go to B. Nor do we attach any persuasive significance to the remaindermen being referred to as child or children. It merely indicates that the testator wished to keep the class open to any additional children of Amy Hansen inasmuch as she had only one child when the will was made and when the testatrix died.

Declaring the intent of the testatrix as the court must, the foregoing construction finds support in the will as a whole. The significance of the will's provisions can be appreciated in the light of the situation then existing with respect to the family of the testatrix, i.e., the Lathrop family. The testatrix had six brothers but no sisters, and, at the time of her death, only two of her brothers were alive, Charles, who had children, and Ariel, who did not. Of the four deceased brothers, only one, Daniel, had left issue. His children were Jennie Lawton, who, on the effective date of the will, had one child, Daniel; Amy Hansen, who had one child, Walter; and Christine Gunning, who had died leaving two children, Daniel and Amy Gunning.

The will disposed of a substantial sum for the benefit of the members of the Lathrop family. One million was left to Charles as an outright gift. The other two million were

placed in trust. Ariel was to receive income from one million dollars for life, and it was provided that upon his death, ''as he had no children or descendants,'' the trust as to that portion ''shall cease and determine'' and that the portion ''shall belong to and be delivered to'' Charles and the descendants of Daniel, Charles to receive one-half, Jennie Lawton one-third of the other half, Amy Hansen another third of the second half and Daniel and Amy Gunning the final third of that half. As to the second million which was placed in trust, income from one-third was to be paid to Jennie Lawton for life, and it was provided that upon her death the trust as to that portion ''shall cease and determine'' and that the portion ''shall belong to and be delivered to'' her child or children. An identical provision, which is the one involved in the present case, was made with respect to another third of the second million in favor of Amy Hansen and her child or children. The final third of that million was left in trust to pay the income to Daniel and Amy Gunning until the younger reached the age of 25, at which time the trust involving this fund ''shall cease and determine'' and the fund ''shall belong to and be delivered'' to them in equal shares; provided, however, that if either child should die prior to the date of distribution then his share to his children or if no children to the other, or if the survivor of the two children also dies prior to the date of distribution then to his or her children or ''heirs at law.''

Following the above dispositions, the will left various bequests to the testatrix' secretary, servants and certain charities. In a subsequent paragraph the testatrix explained that ''Since executing former wills, a Kind Providence has brought about more favorable conditions in the affairs of the Estate left me by my beloved husband, and for this reason I have greatly enlarged my gifts to the Leland Stanford Junior University, and I now feel justified in enlarging, as I have done in this Will, my bequests to my relatives and friends and different charities, which have been ever dear to my heart.'' She then gave certain items of personal property and the residue of her estate to Stanford University.

It seems reasonable to conclude that, as is suggested by the testatrix' explanatory statement quoted above, her dominant purpose ''now,'' that is, in making the will, was to enlarge gifts to the members of the Lathrop family. The manner in which the assets were disposed of reflects some intent to

benefit the Lathrops on a *per stirpes* basis, in accordance with the then existing facts with respect to survivorship and existence of issue. This design is, of course, first indicated by the allotment of one million dollars for the benefit of each of the testatrix' two surviving brothers, as well as for the descendants of the only deceased brother who had left issue. The plan may appear from the provisions with respect to the descendants of Daniel, where the *per stirpes* pattern is expressly applied to succeeding generations. The same indication may be found in the provision disposing of the remainder after Ariel's life interest, where the will, after explaining that Ariel had no children or descendants, divides the remainder equally between, on the one hand, Charles, who had children, and, on the other hand, the descendants of Daniel. The matter which might, at first glance, seem somewhat inconsistent with the suggested pattern is that the gifts benefiting Charles' branch of the family were made directly to him instead of his descendants, but this fact is explained. Unlike Daniel, Charles was alive, and, unlike Ariel, Charles had issue. The evidence shows that the testatrix had complete trust in Charles, and we would seem justified in assuming that she was confident that the gifts left to him would ultimately benefit his descendants on *a per stirpes* basis.

Taken in the light of the foregoing, certain aspects of the will have significance in connection with the question whether a condition of survival was intended in the provision before us.

 In the first place, it seems that the testatrix would not have intended that the descendants of brother Daniel should get more benefit from her property than the descendants of Charles, or vice versa. Yet, such unequal treatment was entirely possible, so far as the testatrix knew, if the words ''shall belong to and be delivered to'' gave rise to a condition of survival. As we have seen, those words were used in every instance in which there was a remainder after an income trust, including the remainder following Ariel's life interest, where the corpus was to go in halves to Charles and to the named descendants of Daniel. Thus, if the language in question made the dispositions contingent, and if Charles predeceased Ariel, the most which Charles' descendants might expect would be the benefit of the one million dollars given outright to Charles, whereas the descendants of Daniel, were they to survive Ariel, would realize the benefit not only of the million provided for them initially, but also of their one-half million share of the remainder following

Ariel's interest. Similarly, under a continent construction, if the named descendants of Daniel, or any of them, predeceased Ariel, the share of the remainder going to that branch of the family would totally or partially fall into the residue, even though they left issue, whereas, should Charles survive Ariel, his descendants might benefit from a million and a half dollars of the testatrix' money.

In the second place, it appears that the testatrix would not have wished to treat unequally descendants of Daniels having the same relationship to him. Yet, if she were held to have intended a condition of survival with respect to the remainders following the life interests of Jennie Lawton and Amy Hansen, such a situation could easily have arisen. For example, so far as the testatrix knew, all children of Jennie might die before her but leave children of their own, who would be entitled to nothing under the contingent construction, whereas, if Amy's children should survive her, their children might expect to benefit. Thus, great-grandchildren of Daniel would receive unequal treatment. In this connection, it should be noted that Daniel's great-grandchildren through Christine were expressly contemplated as possible beneficiaries under the provisions that, should Daniel or Amy Gunning die before reaching the age of 25, the deceased's share of corpus was to go to his or her children, if any. It should not therefore be supposed that the testatrix would have intended that Daniel's great-grandchildren through Jennie Lawton and Amy Hansen would not benefit if their parents failed to survive the intervening trusts.

Another respect in which the will, as a whole, seems opposed to a contingent construction is the indication from the language used therein that the property made available to the Lathrops should in no event fall into the residue. There would appear to be no question in this connection, so far as the outright gift to Charles is concerned. The same is true as to the gift to the Gunnings, since it was expressly provided that, should they die without issue before reaching the age of 25, their interest was to go "to the heirs at law" of the survivor. It is difficult to see why the testatrix would have intended that Stanford be in a different position with respect to property disposed of by the other provisions.

Finally, with reference specifically to the provision under consideration, it should be noted that, so far as the testatrix knew, it was possible that Walter would be the only child Amy Hansen would ever have and that Walter would pre-

decease his mother, leaving children of his own. In such an event, if the testatrix made the remainder following Amy's life interest contingent on survival of Amy, Walter's children could not benefit from it, either through intestate succession or under a will which Walter might make in their favor, and the remainder would go to Stanford under the residuary clause. It is doubtful that the testatrix would have intended to use language making such a development possible, particularly when, as we have seen, she expressly provided in the clause involving the Gunnings that, if either of them failed to survive the intervening trust, his children should take and that, if both of them died without issue before the end of the trust, their gift was not to go to Stanford but to the heirs at law of the survivor. Ruth Barton is, of course, in the same position as children of Walter would have been, had they been the claimants here.

In short, the testatrix' intent in framing the will must be determined in the light of the eventualities which, so far as she was in a position to know, were possible, rather than in the light of what actually developed after her death, and, so viewed, a contingent construction of the words "shall belong to and be delivered to" would seem to be out of harmony with the equal treatment of relatives which she appears to have had in mind.

Since we have concluded that the lower court was in error in deciding that Ruth Barton did not take a portion of the remainder as successor of Walter Hansen, the son of Amy Hansen, who was alive when the testatrix died but predeceased his mother, it is not, therefore, necessary to discuss the contention of Ruth Barton with regard to the effect of the 1906 and 1927 decrees of partial distribution.

Stanford University contends, contrary to the finding by the lower court, that the remaindermen of the devise to Amy Hansen could not include the persons adopted by her as her children. It will be recalled that Amy Hansen had the court approval of an adoption agreement entered in New York in 1924, after the death of the testatrix, by which she adopted her niece, Mrs. Reynolds, an adult, and the two minor children of Mrs. Reynolds, Aimee and Minnie Rochester. The adoption approval provided that the adoption "be allowed and confirmed and henceforth the said Aimee G. Reynolds, Aimee Christine Rochester and Minnie Devereaux Bond Rochester shall be regarded and treated in all respects as the children of said Aimee Lathrop Hansen."

It is clear from the authorities heretofore discussed that the class, children, was to remain open to additional children after the death of the testatrix, and it should be equally clear that children adopted after the death of the testatrix are included as remaindermen.

■ It has been the policy of this state, at least since the adoption of the Civil Code, to accord to adopted children the same status as natural children. "A child, when adopted, may take the family name of the person adopting. After adoption, the two shall sustain towards each other the legal relation of parent and child, and have all the rights and be subject to all the duties of that relation." (Civ. Code, § 228.) "The parents of an adopted child are, from the time of the adoption, relieved of all parental duties towards, and all responsibility for, the child so adopted, and have no right over it." (Civ. Code, § 229.) " 'If the adopted child is by virtue of its *status* to be "regarded and treated in all respects as the child of the person adopting," and is to "have all the rights and be subject to all the duties of the legal relation of parent and child," the right to succeed to the estate of the deceased parent must be included.' (*In re Newman, supra,* 75 Cal. 213, 219 [16 P. 887, 7 Am.St.Rep. 146].)" (*Estate of Pierce,* 32 Cal.2d 265, 268 [196 P.2d 1].)

■ This court has squarely held that ". . . an adopted child has a status with respect to its adoptive parent identical to that of a child born of such parent and succeeds to the estate of an adoptive parent in the same manner as a child born of such parent. . . ." (*Estate of Pierce, supra,* 32 Cal.2d 265, 268.) ■ "The effect of an adoption is to establish between the adopting parents and the child the legal relation of parent and child, with all the legal consequences of that relation, including the child's right to take the family name of the person adopting it. This necessarily implies that the natural relationship between the child and its parents by blood is superseded. The adopting parent is substituted for the parent by blood, who ceases to be in a legal sense the parent, his place being taken by the adopting parent. In other words, from the time of the adoption, the parents by blood are relieved of all parental duties towards, and all responsibility for, the child adopted, and have no right over it.

"The effect of the adoption is not limited to the period of the lives of the adopting parent and the adopted child; and the relation of parent and child, which existed between the

parent by blood and the child prior to the adoption, is not revived by the death of the adopting parent prior to the death of the child.

"Adoption does not affect the citizenship of the adopted child; and a minor does not lose his citizenship because of his adoption by an alien." (2 Cal.Jur.2d, Adoption of Children, § 46.) The Probate Code now reads somewhat differently than at the testatrix' death: "An adopted child succeeds to the estate of one who has adopted him, the same as a natural child; and the person adopting succeeds to the estate of an adopted child, the same as a natural parent. An adopted child does not succeed to the estate of a natural parent when the relationship between them has been severed by the adoption, nor does such natural parent succeed to the estate of such adopted child." (Prob. Code, § 257.) The foregoing policy of our law is a factor in determining whether the term "children" includes an adopted person. It has been said that generally the term "children" might not include adopted children (Rest., Property, § 287; Simes and Smith, The Law of Future Interests (2d ed.), § 724; 144 A.L.R. 670; 70 id. 621) but also: "Similarly, the existence of a statute which simultaneously includes the adopted child as an intestate taker from his adopting parents and excludes him as an intestate taker from his natural parents (see § 288, Comment b) facilitates a finding that the conveyor used the word 'child' with the intent to include thereby such an adopted person, as a child of his adopting parent, even though the requirements of neither Clause (a) nor Clause (b) are satisfied. When such facts concur with other constructional factors having the same constructional urge, the inclusion of the adopted child is justified." (Rest., Property, § 287, com. d.) And it has been held that "children" when used in statutes includes an adopted child. (*Estate of Mercer,* 205 Cal. 506 [271 P. 1067]; *Estate of Moore,* 7 Cal.App.2d 722 [47 P.2d 533, 48 P.2d 28].) In the Mercer case it was said (p. 510): "The weakness of appellant's position is simply that the adopted daughter cannot have the full benefit of her right as a daughter of the deceased husband in her relation to said husband unless the word 'children' in this statute of succession is held to include her. The predeceased spouse had an interest in, if not full ownership of, the property in question. Natural justice suggests that his daughter have an interest therein. In making his will he may have had the very contingency in mind that has arisen, and decedent, too, may,

with knowledge of this statute, have declined to make a will. . . .

"As another illustration, suppose decedent had willed the property to 'my heirs' or to the 'children of my deceased husband,' would there be any question but that such a testament would include the said adopted daughter? Admittedly, in subdivision 1 of section 1386, the word 'issue' included an adopted child (*In re Newman,* 75 Cal. 213 [7 Am.St.Rep. 146, 16 P. 887]; *Estate of Winchester,* 140 Cal. 468 [74 P. 10]; *In re Darling, supra* [173 Cal. 221 (159 P. 606)]). Appellant admits that the word 'issue' in several places in said section does include an adopted child. Again, an adopted child has been held to be a lineal descendant of the adopting parent (*Estate of Winchester, supra; Warren v. Prescott,* 84 Me. 483 [30 Am.St.Rep. 370, 17 L.R.A. 435, 24 A. 948]). If this be conceded, *it argues strongly for the rule that an adopted child is entitled to any legacy the law gives to the children of an adopting parent.*

"The whole matter is concluded by the observation that the cases cited and the principles urged by appellant furnish no sufficient reason for restricting the scope of the word 'children' in the provision under review. To exclude adopted children from its scope would be to say that they are not entitled as to the adopting parent to the full rights of natural children, which is contrary to the express provision of the statute (§§ 227 and 228, Civ. Code), and the terms of the decree of adoption. Even the case of *Hockaday v. Lynn,* 200 Mo. 456 [118 Am.St.Rep. 672, 9 Ann.Cas. 775, 8 L.R.A.N.S. 117, 98 S.W. 585], above referred to, concedes that 'the adopted child is so let in only for the purpose of preserving in full its right of inheritance from its adoptive parent.' " (Emphasis added.)

It is said in *Dyer v. Lane,* 202 Ark. 571 [151 S.W.2d 678, 680]:

"We think a proper construction of this will means, that the testator, when he speaks of 'the heirs of my son, Haskell A. Dyer', meant the children of Haskell A. Dyer. Children may include adopted children as well as the children of one's body. *Deener v. Watkins,* 191 Ark. 776 [87 S.W.2d 994]. In *Powell v. Hayes,* 176 Ark. 660 [3 S.W.2d 974, 975], this court said:

" 'In the alleged will under consideration in this case the testator gave the balance of his property to his wife and heirs, as the law provides. In its strict legal sense the word "heirs" signifies "those upon whom the law casts the inheritance of real estate." But this construction will give way if there

be upon the face of the instrument sufficient to show that it was to be applied to children. *Flint* v. *Wisconsin Trust Co.,* 151 Wis. 231 [138 N.W. 629, Ann.Cas. 1914B, page 67], and case note at page 70; 2 Commentary on Wills by Alexander, pars. 850-852, inclusive; 1 Page on Wills (2d Ed.) p. 1496, § 891; and 28 R.C.L. p. 248, § 216. . . .'' (See, also, *Kelly* v. *Kelly,* 176 Ark. 548 [3 S.W.2d 305]; *Deener* v. *Watkins,* 191 Ark. 776 [87 S.W.2d 994].) In *Estate of Pierce,* 32 Cal.2d 265, 268 [196 P.2d 1], it was held there was a showing that the testator did not intend to include adopted children by the use of the term lawful issue and that the adoption statutes do not require, in the face of other evidence, that such words include an adopted person. ▇▇▇ The status of an adopted child should be of some significance in construing a will for the testator may be said to realize the possibility of adoption and its effect. It has been well said: ''. . . by investing an adoptee with a particular status, such as that of a 'child' of the adopter, the statute may have the inclusionary effect of tending to bring the adoptee within a designation. Thus, if the statute declares that the adoptee shall be deemed a 'child' of the adopting parents as fully as though born to them in lawful wedlock, it is properly one of the circumstances in the light of which a devise to the 'children' of the adopting parents should be read. Where it is the sole surrounding circumstance of any materiality, the argument may be advanced that it supplies the conveyor's meaning. . . .

''[I]t is interesting to discover that even sixty years ago the Supreme Court of Alabama had no difficulty in concluding that, absent language in the adopting statute confining the adoptee's rights to those of inheritance, it would have been the probable 'duty' of the court to hold that an adopted child took under the term 'children' in a will, for the reason that by dictionary definition adoption is 'an act by which a person appoints as his heir the child of another,' and means 'to receive and to treat as a son or daughter one who is the child of another,' and 'to take into one's family as son and heir; to take and treat as a child, giving a title to the privileges and rights of a child.' To this thought, then expressed, can be added now the further one that by a century of development in states with a background of common law the institution of adoption, though not indigenous to us, has become 'naturalized' here and is an important and familiar adjunct of our society and our law. It cannot be dismissed as involving the unusual. . . .

"Other adoption statutes, however, in growing number, do not restrict the status of the adoptee to that of an heir of the adopter or to that of a child for purposes of enumerated benefits only. The trend is toward making the adopted child a child of the adopter to all intents and purposes. Thus, in upwards of twenty-five jurisdictions, including a few already mentioned as having narrow statutory provisions with respect to the actual effect of the adoption, the portion of the adoption statute relative to the making of the decree provides for a declaration therein that the adoptee shall be the child of the adopter 'to all legal intents and purposes,' or that he shall be regarded and treated 'in all respects' as the child of the adopter, or that the rights, duties, privileges and relations between the adoptee and adopters shall 'in all respects' be those of a child born in lawful wedlock. . . .

"Unrestricted by such an amendment, the wide language of the original Massachusetts statute and others like it can reasonably be taken to supply a prima facie meaning for 'child,' when used in a private instrument, which would include an adoptee. This is indicated by *Sewall* v. *Roberts*, *supra* [115 Mass. 262], and it is the conclusion reached or suggested in some other cases, both where the conveyor himself was the adopter and where he was not. . . .

"For the purposes of the discussion it was more or less tacitly assumed that the adoption statute constituted one of the circumstances surrounding the formulation of the language of the instrument, and was to be considered as such. This was in harmony with the announced attitude of most courts which have taken the trouble of referring to the point at all. Otherwise stated, it is presumed that the instrument was executed in the light of knowledge of the then existing adoption law. A few courts only would disregard the adoption statute entirely or openly belittle its position among the surrounding circumstances. There is more common and proper reluctance to attach to the statute, in its relation to the construction of a private instrument, a presumptively controlling significance in the face of other circumstances which may be felt to be of importance also. . . .

"No one can read the cases on this subject without soon becoming aware of what for the most part is an unexpressed but nonetheless perceptible attitude of fear on the part of the courts that, unless they guard well against it, the institution of adoption may be an implement of self-advancement,

fraud or spite in the hands of adopters seeking to use it deliberately to meet requirements of an instrument, such as a will, that the adopters have children. There has been some basis for this fear in the facts of a few of the cases.

"The danger to which reference has just been made is doubtless most real where the adopter himself, as distinguished from the adoptee, will benefit if the conditions with respect to his having children can be met by him. It is thought there is significance in the fact, therefore, that in no instance where an instrument gave to a person a restricted estate, which would ripen into a larger one if he should have children, did the court permit the increase in his interest and the defeat of the gift over to be accomplished through an adoption. So where a testator's nephew was to receive a third of the income from a trust for life or until he should have a child that should attain the age of three years, and in the latter event he was to receive a third of the principal, the court held that, having no natural children, he did not qualify for the corpus share, although he and his wife took a child of about six months into their household approximately a year after the testator died, and adopted the child three years later. And there is authority that one given a fee simple estate, defeasible in event of his death without children or issue, could not by subsequent adoption acquire an absolute estate and avoid the executory limitation. . . .

"If, as is the usual case, the adopter has a life estate only, but his children, issue or other relatives are to take the remainder, with gift over to others if he die without children, etc., then the chances of direct personal gain to the adopter are not great, even if adopted children should qualify as takers within the meaning of the will. In this situation, however, courts seem moved by a fear that if they should recognize adoptees as qualifying under the will to take the remainder, the life tenant might adopt a child simply to defeat the gift over to others. . . .

"The possibility of the use of adoption for avaricious or spiteful purposes cannot be denied. The probability of its employment for those ends is believed, however, to be slight under modern adoption statutes contemplating a thorough investigation into such matters as the motives of the prospective adopter. It should be time enough to speculate upon possible fraudulent use of adoption when the fraud is found. And in considering policies involving the public interest, a court ought not overlook any which may be manifested by the

legislature in placing adopted children on a level with natural children 'to all intents and purposes.' '' (43 Mich.L.Rev. 705, 710 et seq.)

Coupled with the foregoing we have a letter written by the testatrix in 1897, seven years before the execution of her will, to inform the president of Stanford University of the fact that neither she nor her husband had ever adopted testatrix' niece, the daughter of her brother Charles Lathrop. The letter shows that Charles' wife died when his child, Jennie, was an infant and before her request of Mr. Stanford to take care of the child. Mr. Stanford was opposed to taking the child in as their own but Jennie was cared for by the testatrix. The testatrix said she placed the letter on record with Stanford University because ''So very many unexpected and new phases in human nature have been brought to my attention, and in a way have added to my sorrows—some hearts have hardened towards me who should have been sympathetic and tender because of my dear husband's loving remembrance of them and these revelations of character have led me into a train of thought that impels me to write this letter to you that you may fully understand the relations that exist between my niece Jennie L. Lathrop and myself.'' And in closing, ''I make this explicit explanation in this letter to you that you may hold it sacred and if . . . the subject would be discussed whether or not Jennie L. Lathrop had been adopted, you can use this letter and defend me.

''I hope and pray that there will be no need to ever produce it, but I have learned by very sad experience the greed for gain tempts beyond the ability to resist. My dear brother Charles G. Lathrop the Father has been most kind in allowing me to care and do for her as best pleased me, and he will never deviate from his love and loyalty to me, or my memory.''

The letter also states that Jennie and all the children of Mrs. Stanford's brothers, then living, had been given one hundred thousand dollars in her husband's will. She expresses the opinion that she has won the love and devotion of this niece. From this letter the trial court concluded that Mrs. Stanford understood the meaning and effect of adoption, that she believed that an adopted child would have the same rights as a natural child, hence when she made a bequest to the ''child or children'' of her niece, Mrs. Hansen, she intended to include any children that Mrs. Hansen might adopt.

While the letter is not conclusive evidence, it, together with the foregoing public policy with reference to adoption and

the status of the person adopted, shows that the testatrix had considered the matter of adoption and its effect upon the person adopted.

There is no merit to Stanford University's claim that the New York adoption was not an adoption. Mrs. Hansen and Mrs. Reynolds and her children appeared before the New York court consenting to the adoption and the court approved it. While there may have been some irregularities in the proceeding they are not of sufficient importance upon which to base a collateral attack. While the divorced husband of Mrs. Reynolds and the father of the children may not have been notified (the proceedings do not show whether or not he was) and did not consent, we fail to see how that will avail Stanford University here. The adoption has stood for many years, since 1924, without attack by anyone. (See, *Estate of Smith*, 86 Cal.App.2d 456 [195 P.2d 842].)

Stanford University has not established that the adoption was void and it must be presumed to have been valid. (*Estate of Smith, supra*, 86 Cal.App.2d 456.) The effect of adoption under the New York law and construction of the will is not important. We are not here concerned with a question of inheritance but with the construction of a will, and whether "child or children" includes adopted persons. The construction of the will is governed by California law (see Prob. Code, § 100; Rest., Conflicts, § 308). Stanford University suggests that the adoption was not made in good faith but merely for the purpose of inheritance—to bring the adopted persons under the will to the exclusion of Stanford University, the residuary legatee. This the lower court felt was not established and it is doubtful if it would be significant if it had been unless it showed the invalidity of the adoption which it does not. We find nothing in the will or the surrounding circumstances favoring Stanford University over the interpretation we have given the will.

The decree is reversed with directions to the trial court to order distribution of the property in accordance with the views herein expressed.

Gibson, C. J., Traynor, J., and Schauer, J., concurred.

ASHBURN, J. pro tem.,* Dissenting.—Unable to concur in the prevailing opinion, I feel impelled to express my views upon the proper approach to this case and its ultimate disposition.

---

*Assigned by Chairman of Judicial Council.

Fifty-four years after the execution of the last testament of Jane Lathrop Stanford it becomes the province of this court to construe one phase of that will, which creates a trust for the benefit of testatrix' niece, Amy L. Hansen, during her lifetime, with remainder to "the child or children of said Amy L. Hansen." The paragraph giving rise to this litigation is phrased as follows: "c. To pay over at regular intervals to my niece, the said Amy L. Hansen, the full one-third of the net income arising from said one million dollars, being one-half of said trust fund, for and during the term of her natural life, and upon her death this trust shall cease and determine as to one-third of said one million dollars and the said one-third of said one million dollars shall belong to and be delivered to the child or children of said Amy L. Hansen."

The will is dated July 28, 1903; Mrs. Stanford died on February 28, 1905. Her niece, Amy L. Hansen, was 37 years of age when the will was made; she had one son, Walter L. Hansen, who was then 13 years old; he died on October 21, 1918, without issue, at the age of 28, leaving all his estate by will to Mrs. Ruth Barton, who was not a relative of Mrs. Stanford but a total stranger to her. His mother, Amy L. Hansen, survived him. Some 19 years after the death of Mrs. Stanford, on February 23, 1924, Mrs. Hansen adopted under the laws of New York her own niece, Aimee G. Reynolds, an adult, and Aimee's two minor children now named Minnie Devereaux Bond Rochester and Aimee Christine Muniz. These children had not been born at the time of Mrs. Stanford's death and she had had no information about any such prospective adoption and no reason to anticipate it as a probable future event.

Mrs. Hansen having died without issue of her body then surviving, the trust terminated on August 4, 1954. Mrs. Barton, as legatee and distributee of the entire estate of Walter L. Hansen, claimed the Stanford trust estate upon the theory that it vested in Walter upon the death of Mrs. Stanford and passed to claimant through his will; also that the word "children" in the quoted paragraph of Mrs. Stanford's will did not include any adopted children of Mrs. Hansen. Those adoptees assert ownership of the trust remainder upon the theory that Walter's interest was contingent upon his surviving his mother and ceased upon his death prior to her demise; that the word "children" included those adopted by Mrs. Hansen and hence they were entitled to the remainder. As residuary legatee named in the will, The Board of Trustees

of the Leland Stanford Junior University[1] claimed sole right to the trust estate, asserting Walter's interest to have been contingent and to have lapsed upon his death prior to termination of the trust; also that the word "children" as used in the will does not include adopted children of the niece, Amy L. Hansen.

The controversy arose upon petition of Wells Fargo Bank and Union Trust Company, as successor trustee, for an order declaring the trust terminated and determining the persons entitled to distribution of the trust estate. The trial court, after a contested hearing, upheld the claims of the adoptees in their entirety and ordered distribution of the trust estate in equal shares to respondents Aimee G. Reynolds, Minnie Devereaux Bond Rochester and Aimee Christine Muniz. The University and Mrs. Barton appealed separately, each asserting title to the trust estate to the exclusion of all other claimants.

All authorities agree that the paramount desideratum in the construction of a will is the ascertainment of the testator's intention as expressed therein through words or fair implication. "It is generally recognized that a testamentary instrument is to be examined with a view to discovering the decedent's testamentary scheme or general intention, and that the apparent meaning of particular words, phrases and provisions is to be subordinated to this scheme, plan or dominant purpose. The technical import of words should not prevail over the obvious intent of the testator." (*Estate of Puett,* 1 Cal.2d 131, 133 [33 P.2d 825].)

It is contended by appellant Barton that there was error in receiving parol evidence over objection because the will is unambiguous upon its face. It is a mistaken notion that a will can be interpreted without reference to the property or the persons upon which it operates or the circumstances in which it was made. (See *Paley* v. *Superior Court,* 137 Cal. App.2d 450, 455-456 [290 P.2d 617].) When the language of the document before us is applied to its factual setting, an ambiguity arises. (See the most recent definition of ambiguity in *Beneficial etc. Ins. Co.* v. *Kurt Hitke & Co.,* 46 Cal.2d 517, 524-525 [297 P.2d 428].) Such an uncertainty, whether deemed latent or patent, is removable by resort to extrinsic evidence. (*Paley* v. *Superior Court, supra,* at page 457; *Estate of Sargavak,* 41 Cal.2d 314, 319 [259 P.2d 897]; *Estate of Pierce,* 32 Cal.2d 265, 273-274 [196 P.2d 1].) When the

---

[1]Hereinafter designated as University.

words "child or children" are applied to the facts at bar a substantial ambiguity arises, first, as to whether a child who was living at testatrix' death must survive the life tenant in order to take full title or on the other hand immediately acquires an equitable fee which he may pass by assignment or testamentary disposition; secondly, whether those words embrace persons adopted by the life tenant many years after testatrix' death. There was no error in receiving the extrinsic evidence at bar. True, it did not go to testatrix' intent concerning the legal concept of vesting (the point made by Mrs. Barton's counsel), but it did reflect direct light upon her intention as to who should have her property and when and on what conditions. Indeed, in the absence of the use of technical terms in their strict sense, testatrix' intention as to the legal effect of what she had provided in the will cannot control. That is governed by substantive law. (See 57 Am.Jur. § 1134, p. 729.)

Our search for the intention of Mrs. Stanford as expressed through her "testamentary scheme or general intention," the "scheme, plan or dominant purpose" found within the four corners of the document, requires a close inspection of the will within its matrix. First we must examine the document itself. In this instance the terms of the trust as set forth in the will are quoted verbatim in the decree of partial distribution which evidences the trust; "upon the trusts provided for by the said last will of Jane L. Stanford, deceased, said trusts being expressed in said will as follows, namely." In such situations an interpretation of the decree depends upon the construction of the will itself. (*Manning* v. *Bank of California,* 216 Cal. 629, 637-638 [15 P.2d 746]; *Canfield* v. *Security-First Nat. Bank,* 13 Cal.2d 1, 18-19 [87 P.2d 830]; *Estate of Ryan,* 96 Cal.App.2d 787, 791-792 [216 P.2d 497].)

When executing the will Mrs. Stanford had two living brothers. To one of them, Charles Gardner Lathrop, she gave a million dollars outright. For the benefit of the other one, Ariel Lathrop, and the descendants of a deceased brother Daniel Shields Lathrop she created a trust of two million dollars. The income from one-half thereof was to be paid to Ariel during his lifetime, "and upon his death (as he has no children or descendants), this trust shall cease and determine as to one-half of said trust property" and same "shall belong to and be delivered to his relatives," i.e., one-half to brother Charles and one-half to descendants of deceased brother Daniel, in the following shares, viz., one-third to his daughter

Jennie L. Lawton, one-third to his daughter Amy Gardner Hansen, and the other one-third in equal shares to Daniel S. Gunning and Amy L. Gunning, grandchildren of said deceased brother Daniel and children of his deceased daughter Christine L. Gunning. Ariel's half of the original trust was not to remain in trust, but the other half, one million dollars, was to be held by the trustee for the benefit of the same relatives and in the same proportions as just outlined. Paragraph c of section I, above quoted, defines the trust for Amy L. Hansen. Jennie L. Lawton, the other niece, had one child then living and the trust for her benefit was couched in exactly the same terms as the one created for Mrs. Hansen and her child or children. The provision for the benefit of the Gunnings (d of I) is set forth in the margin.[2] A bequest of $15,000 was made to Miss Bertha Berner, who had been "Secretary and devoted friend" for nineteen years; five servants were left $1,000 each; charitable gifts of $5,000 and $10,000 were made to fourteen eleemosynary institutions, an aggregate of $105,000. Paragraph XIX contains this: "Since executing former wills, a Kind Providence has brought about more favorable conditions in the affairs of the Estate left me by my beloved husband, and for this reason I have greatly enlarged my gifts to the Leland Stanford Junior University, and I now feel justified in enlarging, as I have done in this Will, my bequests to my relatives and friends and different charities, which have been ever dear to my heart." Para-

---

[2] "To pay over, one-half to each, at regular intervals, to said Daniel S. Gunning and Amy L. Gunning, the children of my deceased niece Christine L. Gunning, one-third of the net income arising from said one million dollars, the said one-half of said trust property, until such time as the younger of the two shall reach the age of twenty-five years, at which time this trust shall cease and determine as to one-third of said one million dollars the one-half of said trust property, and the said one-third shall belong to and be delivered to said Daniel S. and Amy L. Gunning, absolutely and in their own right, share and share alike, and free from all trusts; provided, however, that if either should die before the younger attains the age of twenty-five years, this trust shall cease and determine as to one-half of said one-third of a million dollars and that proportion of the trust property shall belong to and be delivered to the children of the one so dying, or, if there be no such children, then to the other; and the trust shall thereafter continue as to the other one-half of said one-third of a million dollars until the survivor reaches the age of twenty-five years, at which time the trust as to the remainder of said one-third of a million dollars shall cease and determine and the property shall belong to and be delivered to said survivor, but if such survivor dies before attaining such age of twenty-five years this trust shall then cease and determine and the trust property shall belong to and be delivered to his or her children, or if there be none such, then to his or her heirs at law."

graph XXI states that testatrix' silver dinner set, gold plated service, certain "special gifts of affection from my husband, and other silver, are designated already in a deed of gift to the Trustees," and adds: "[A]lso all works of art, paintings, curios, china of rare quality, photographs, rare old furniture, vases, clocks, statues of all kinds, marbles, bronzes, mosaics of all kinds, marble busts, already given to the Trustees from my home at Palo Alto Farm and San Francisco also included and to be placed in the Museum as aforesaid named, and I hereby confirm the gift of the articles mentioned in this Paragraph." The residue of the estate is left to the University in these words: "All the rest, residue and remainder of my property and estate, of every kind and nature and wheresoever situated, not hereinbefore disposed of, I give, devise and bequeath to the Board of Trustees of the Leland Stanford Junior University as founded and endowed by my husband and myself by our joint grant of November eleventh, 1885, recorded in the County of Santa Clara, in Liber 83 of Deeds, at page 23 et seq., and confirmed by grants dated December 9th, 1901, to have and to hold to the said Trustees and to their successors forever as an integral part of the endowment of the said University, . . ." Then follow requests that the University trustees preserve certain articles in the museum, certain ones in the library building, and others in the memorial room of her husband in the museum building. Paragraph XXV is the disinheritance provision. It starts with these words: "Of the large Estate committed to the hands of my husband and myself, I have made what I consider the wisest and most just disposition, and the disposition most in accordance with the cherished wishes long entertained by my husband and myself, and I shall greatly deplore any attempt to disturb it;" then it reduces to $100 the share of any successful or unsuccessful contestant, heir or legatee, and directs that the balance of such share "that would otherwise have gone to such person or persons by devise or inheritance shall pass under the residuary clause of the said Will."

The will, when applied to facts presumptively within the knowledge of testatrix, indicates that it was not made solely for the benefit of relatives. The appraised value of the estate was $3,391,871.32. Three million dollars were left to the relatives, $125,000 to employees and charities. Under the decree of final distribution the University as residuary legatee received $26,003.60 in cash, 200 Northern Pacific Railway Company bonds having face value of $200,000 (25 of such

bonds were appraised at $28,250), and other bonds having $1,500 face value; a grand total of about $227,500; the exact figure does not appear in the record. It is significant that the contest clause of the will provides that the share of one who attempts to defeat its provisions in any respect shall be reduced to $100 and the balance thereof shall go to the University rather than other relatives who have not attempted to frustrate the testatrix' plan for division of her property.

On August 10, 1904, Mrs. Stanford made a holographic codicil to the will, which disposed of items of jewelry that well might have been divided among the nieces and great-nieces, but it mentioned no one other than the University. Her executors were instructed to sell her private car "Stanford," certain enumerated valuable jewels and all other jewels not previously given to the University, and to turn over the proceeds to the trustees of the University "to be held and used by the said Trustees for said University upon the trusts referred to in the foregoing Will." This later writing plainly discloses that the will of 1903 had not exhausted Mrs. Stanford's desire to benefit the University and that the phrase of the will, "I now feel justified in enlarging, as I have done in this Will, my bequests to my relatives and friends and different charities," did not imply an intent to do so at the expense of the University except to the extent therein specifically stated.

Significant and outstanding facts about this will and its codicil are concern for blood relatives and for the University which testatrix and her husband had founded. Aside from said employees and specified charitable institutions there is no word indicative of a desire to share her fortune with strangers to the blood. There is nothing to suggest a desire to benefit adopted children of any of the named relatives, nothing to show that the subject matter was in her mind at all.

The extrinsic evidence is illuminative upon the dominant purpose and scheme of the will—to provide for the University and testatrix' own close relatives.

Her relations with her kindred were not close but were affectionate; they seem to be included in that sense in the phrase of the will, "my bequests to my relatives and friends and different charities, which have been ever dear to my heart."

As stated in the will, testatrix and her husband had founded and endowed the university in 1885, naming it for their only son who had previously died. In an address to the trustees

of the university which she made less than a year before executing the instant will Mrs. Stanford described the basic purpose of the original endowment and later gifts, saying: "The moving spirit of the Founders in the foundation and endowment of the Leland Stanford Junior University was love of humanity and a desire to render the greatest possible service to mankind. The University was accordingly designed for the betterment of mankind morally, spiritually, intellectually, physically and materially. The public at large, and not alone the comparatively few students who can attend the University, are the chief and ultimate beneficiaries of the foundation."

Thus inspired, this deeply religious woman who acknowledged her gratitude to God in her last will,[3] undertook the burden which her husband had laid down during or just before the panic and depression of 1893. He had left $2,500,-000 to the university but the closing of his estate was delayed and the money not received until 1898, after the most crucial needs of that institution had been supplied by the widow. The estate was involved in litigation with the United States government and closing was thus delayed. Mrs. Stanford had only the family allowance of $10,000 awarded her by the probate court. She had to close down "a great vineyard in Tehama County" known as the Vina ranch, sold many fine horses, closed her city home, dismissed all servants except Ah Wing (who was her servant for 20 years before the will was made). To obtain action upon the government lawsuit she journeyed to Washington and laid that case and the exigencies of the University before President Cleveland, who forthwith expedited the hearing of the lawsuit for her. She wrote him a letter expressing her gratitude, which contained the following look at the future: "Since my visit to Washington I have decided to keep the doors open of the University another year hopeing and trusting in an all Wise God that it will go on as long as the State of California exists." To Governor Budd she described her action and her motives in a letter which says: "I felt it a sacred duty to my husband, my son, and the blessed work to lay before the President and the Attorney General the desperate struggle I had made to

---

[3] "I wish thus publicly to acknowledge my great gratitude to an all-wise, loving Heavenly Father for His sustaining grace through the past ten years of bereavements, trial and disappointments. In all I have leaned hard on this Great Comforter and found rest and peace. I have no doubt about a future life beyond this; a fair land where no more tears will be shed and no more partings had."

keep the doors of the Institution open, trusting to a loving Heavenly Father's help for support in my hour of need. I was not utterly disheartened until I learned the Government suit might be prolonged for years. Under such adverse circumstances I was unable to reengage the President and faculty for another year, for I have no private fortune and I had, as far as possible, reduced all my personal expenses, sold all I could, and given all the Courts allowed me, for its maintenance the past two years. This has cost me a struggle far beyond the world's conception, and to fail now meant giving up all I live for." In a letter of 1896 she described the University as·"the Institution which was so dear to the heart of my husband and dearer still to me because of the great burdens which I have had to carry in order to insure its existence." During one period she gave regularly to the University $10,000 a month but its expenses were $19,000 and she managed somehow to supply the other $9,000. In 1897 she gave her home and contents to the University, subject to a reserved life estate. In June of that year she donated to it bonds having face value of $900,000. These latter gifts were made contrary to her attorney's advice and she wrote to President David Starr Jordan in August, 1897, saying: "I am only anxious to furnish you with funds to pay the needs required. I could live on bread and water to do this my part, and would feel that God and my beloved ones in the life beyond this, smiled on efforts made to ensure the future of my dear husband's work to better humanity." In December, 1898, she wrote Dr. Jordan again, saying: "You know dear trusted friend that every·dollar I can rightfully call mine is sacredly laid on the Alter of my love the University, and thus it will ever be."

In May, 1899, coincident with large gifts of land to the University she made an address to the trustees containing these words: "Being of sound and disposing mind and memory, and mindful of the uncertainty of life, I deem it to be my sacred duty to so put my house in order that when I am called hence from mortal life, I can feel that I have done all that I could to further advance and insure the future of the great work which was so sacredly left to my care." At about that same time an instrument of gift to the university carried this language: "Of the large Estate committed to the keeping of my husband and myself, I have made what I consider the wisest and most just disposition, and the disposition most in accordance with cherished wishes

long entertained by my husband and myself.'' The opening expression of paragraph XXV of the will of 1903 is in almost identical language. In July, 1900, Mrs. Stanford gave the University certain bonds having face value of $12,426,000.

Just as courts consider oral evidence of affection for the natural objects of a testator's bounty, or lack of such affection, in determining the probable intent of language used in his will, so it is proper to consider here this background of affectionate concern of testatrix for the University which to her stood as a monument to her deceased husband and her only son and as an outlet for her own desire to serve her God and humanity. It has a direct bearing upon the general scheme and plan of her will. This evidence and the inferences deducible from it stand uncontradicted and it cannot be said fairly that this will bears any connotation of a desire to benefit any stranger (except the designated servants and charities), or any adoptee whose artificial status Mrs. Stanford had no occasion to anticipate. Subject to the specified exceptions (servants and charities) the scheme of this will is provision for blood relatives and for testatrix' beloved university. An actual intention to provide for persons such as a legatee of Walter Hansen, or an adoptee of Mrs. Hansen, cannot be read into this will which, to say the least, is absolutely silent on these subjects. How then does the matter stand as one of substantive law? Is there some construction which the law imposes upon the testatrix' expression of intent *nolens volens*?

It cannot be denied that this gift to Mrs. Hansen for life with remainder to her ''child or children'' is a class gift. ''As to a gift to a class the rule is stated as follows: 'In legal contemplation a gift to a class is a gift of an aggregate sum to a body of persons uncertain in number at the time of the gift, to be ascertained at a future time, who are all to take in equal or some other definite proportions, the share of each being dependent for its amount upon the ultimate number.' '' (*Estate of Murphy*, 157 Cal. 63, 67 [106 P. 230, 137 Am.St. Rep. 110].) The Restatement of the Law of Property, § 279, comment a, at page 1453, says: ''The intention of the conveyor that there be the possibility of fluctuation in the number of takers is the factor which differentiates a class gift from a gift to individuals singly.'' Nor is there any dissent among the authorities from the proposition that a class gift automatically opens to receive and benefit new members, e.g., a child of a life tenant born after the testatrix' demise. But

on the subject of whether the death of a class member before time for distribution terminates his interest and thus enlarges those of the survivors there is a contrariety of judicial expressions. Enlargement of the class and shrinking of its membership present two different questions.

Subsection 2 of section 296 of the Restatement (page 1607) says: ''From the fact that a class can increase in membership until a certain future date, no inference should be made that only such members of the class as survive to such future date become distributees.'' The first rule (opening for new members) is undoubtedly settled as a matter of law. But the effect of a decrease in membership of a class has not crystallized into an inflexible rule of substantive law. ''Whether a remainder vests in designated persons in their individual right, or whether it passes to members of a class taking as a group which is to be fixed and determined in the future, is a matter of testamentary intention which must be ascertained from the text of the whole will viewed in the light of the surrounding circumstances. . . . There is no judicially approved formula either of text or attending circumstances that will in every case solve the problem; each will must be construed upon its own particular language and against its peculiar background.'' (*In re Cameron's Estate* (Surr.Ct. N.Y.), 66 N.Y.S.2d 763, 764.) In the present state of the authorities the effect of a decrease in class membership presents primarily a question of the testator's intent that survivorship be a condition precedent or subsequent to one's beneficial enjoyment as a class member.

Discussion of the problem in terms of contingent or vested remainder is not conducive to enlightenment. Mr. Justice Cardozo, in *New York Life Ins. & Trust Co.* v. *Winthrop*, 237 N.Y. 93 [142 N.E. 431, 432, 41 A.L.R. 791], said: ''When we speak in this connection of the vesting of an interest, we mean, of course, a vesting that is absolute and final. The statutory definition of vested and contingent estates sheds little light upon the problem, for an estate may be vested within the definition of the statute, though defeasible by death before the moment of division. [Citations.] The only significant distinction for the purpose now in view is between an estate that is absolute and one subject to conditions.'' Gray on The Rule Against Perpetuities, Second Edition, section 110a, page 83, says: ''The placing this class of remainders under the head of vested remainders is to some extent artificial,'' and in section 205a, at page 171: ''Though the interest is called vested, it is in truth contingent.''

Section 296 of the Restatement, at page 1607, says: "(1) A 'possible taker' under the terms of a limitation in favor of a class described as 'children,' . . . of a designated person is excluded from being a distributee of the subject matter of such class gift if . . . (b) he fails to survive to the time to which he is required to survive by the terms of the limitation." At page 1609: "When the subject matter of the class gift is an aggregate sum, the exclusion of a 'possible taker' by the application of one of the rules stated in the Clauses of Subsection (1) increases the share of each distributee under such limitation not thus excluded (see Illustrations 1 and 6). Herein lies one of the major importances of construing the limitation to be in favor of a class rather than in favor of specific individuals (see Introductory Note to this Chapter, third paragraph)." At page 1611, comment f: "It is immaterial under the rule stated in Clause (b) of Subsection (1) whether this requirement of survival is imposed as a condition precedent of the interest created or as a defeasibility thereof operative upon the failure of such person to survive."

Simes & Smith, on the Law of Future Interests (2d ed.), section 640, page 78: "Where a gift to a class is postponed, so far as distribution is concerned, until the termination of a prior life estate, it is clear that the general rule of construction would permit the class to increase until the end of the life estate, but would exclude all members of the class who were not in being at the termination of the life estate. Such, in fact, is the common result, with reference to gifts of both personalty and realty. Such an application gives effect to the probable desire of the transferor to include as many members as possible and to the principle of convenience in closing the class when the time has come for distribution." Section 652, page 103: ". . . Phrased in another way, the question is whether there is any requirement of survival to a particular point of time. In many of the cases, the question is frequently discussed in terms of whether the gift is vested or contingent —it being assumed by the court that if the gift is vested there is no requirement of survival, and that if it is contingent there is a requirement of survival. We have already seen, however, that analysis in such terms tends to obscure the real issue, since it is possible for a vested interest to be subject to a requirement of survival in the form of a condition subsequent, and it is also possible to have a contingent interest which is transmissible and which does not terminate with the death of the owner thereof."

It is also important in considering this subject to differentiate those cases which deal with gifts to a class consisting of testator's own children or grandchildren and those in favor of a class composed of the children of some other person, such as a collateral relative, which is the instant case. Equally important is the differentiation of those cases dealing with a class which has not been exhausted as to membership. The cases dealing with these two categories often arrive at a conclusion of indefeasible vesting, this on the basis of a presumed or inferred intention of the testator. In considering the claims of Mrs. Barton, apart from those of respondent adoptees, we deal with a class whose membership had been exhausted prior to the time for distribution. We shall for the present discuss this aspect of the case.

Mrs. Stanford's will plainly shows that she wanted the University to have anything that would not pass to the persons and in the manner specified in that instrument; this through the gift of the residue and the disinheritance clause above quoted. If a condition of survivorship of Walter L. Hansen was essential to that end then such survivorship was an implied term of the will. To infer that testatrix intended Walter to be able to substitute some stranger as the recipient of a third of a million dollars of her property is to my mind too legalistic.[4] There is not a scintilla of evidence that Mrs. Stanford actually intended any stranger to take any part of the Hansen trust through any device or in any circumstances whatever.

The suggestion that Mrs. Stanford probably foresaw the possibility that Walter Hansen would predecease his mother leaving issue surviving him, that she would not want to cut such issue off or treat them differently from the issue of her niece Christine L. Gunning, that therefore there was no implied condition of survivorship attached to the gift to Walter Hansen, does not find support in the will or any other evidence. Subdivision d of I of the will, which immediately follows the Amy L. Hansen trust, deals with the descendants

---

[4]All presumptions and constructional preference rules must yield to ascertained intention of the testatrix. "The paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible. (Civ. Code, §§ 1317, 1318.) Statutory rules of interpretation are to be followed insofar as they aid in determining the intention of the testator, but they are all subject to the fundamental rule that the intention *as shown by the will* must prevail." (*Estate of Wilson*, 184 Cal. 63, 66-67 [193 P. 581].)

of the deceased niece Christine L. Gunning; it plainly contemplates death of a grandniece or grandnephew without surviving issue for it says so,—"or, if there be no such children, then to the other" and "shall belong to and be delivered to his or her children, or if there be none such, then to his or her heirs at law." If, as asserted, Mrs. Stanford had in mind the possibility of Walter's demise leaving issue, her failure to mention that event in the preceding paragraph c is highly significant as a showing of deliberation in refraining from any further disposition than one "to the child or children of said Amy L. Hansen." Moreover, the intention which courts must seek in construing a decedent's will is intent with respect to the facts to which it must be applied, intent with respect to things that have happened, not those that never occurred.

If the interest of Walter L. Hansen in the trust be viewed as contingent, subject to condition precedent that he survive distribution, it lapsed upon his death (*Estate of Easter,* 24 Cal.2d 191 [148 P.2d 601]), and fell into the residue. If it be viewed as a vested interest it was vested subject to defeasance. All vested class interests are subject to partial defeasance upon entrance of a new member into the class and are subject to complete defeasance where the class membership is exhausted and testator's intention that the gift shall thereupon fall into the residue is fairly apparent.

For convenience the rule of section 296 of the Restatement is again quoted: "(1) A 'possible taker' under the terms of a limitation in favor of a class described as 'children,' . . . of a designated person is excluded from being a distributee of the subject matter of such class gift if . . . (b) he fails to survive to the time to which he is required to survive by the terms of the limitation."[5] This has been recognized in this state as sound doctrine. The latest pronouncement on the subject which was in existence at the time of Mrs. Stanford's making her will was that of *Estate of Cavarly,* 119 Cal. 406, 410 [51 P. 629]: "It is the rule that when a testamentary disposition is made to a class, and possession is postponed, it includes all persons within the class at the time to which pos-

---

[5]The Restatement amplifies this at page 1610 by this illustration: "1. A has a son B who has children C and D. A, owning Blackacre in fee simple absolute, executes an otherwise effective will devising Blackacre 'to B for life and thereafter to the children of B in fee simple absolute.' C dies. A dies and his will is duly probated. C is excluded from being a distributee of Blackacre. B dies. In the absence of an applicable lapse statute (see § 298) D acquires an estate in fee simple absolute in the whole of Blackacre."

session is postponed. (Civ. Code, § 1337.) It is also a rule of construction of a gift to a class that only those are included who are in existence at the time of the distribution. (Gray on Perpetuities, sec. 698.)'"[6]

*Estate of Clark,* 64 Cal.App.2d 636 [149 P.2d 465] (hearing denied), dealt with a trust for the benefit of Walter C. Miller, a nephew of decedent, same to go upon his death to his "surviving lawful issue." Miller died leaving three children; one of them, Margaret Miller Dorstewitz, died later leaving two adopted children but no issue of her body. Held that the adopted children could not take and that the other children of Walter C. Miller would take to the exclusion of Mrs. Dorstewitz' heirs because she did not have a vested, indefeasable estate. The opinion says, at page 641: "A gift to a class is a gift of an aggregate sum to a body of persons uncertain in number to be ascertained at a future time, all to take in some definite proportions, the amount of the share of each being dependent upon the ultimate number of the class. (6 Jarman on Wills, § 232; Rest., Law of Property, p. 1451.) When members of a class pass on, the surviving members take to the exclusion of the devisees or heirs at law of such deceased member. (3 Page on Wills, Lifetime ed., § 1058.) Thereby, the share of a deceased member increases the share of the survivors of the group. (*In re Wood's Estate,* 321 Pa. 497 [184 A. 13].)" And at page 642: "The class is to be ascertained when the duty arises to convey and deliver, and survivorship at that time is one of the conditions of the gift. . . . A gift to 'surviving lawful issue' is not to individuals named but to a class of designated persons the members of which are to be ascertained either at the death of the specified beneficiary or at the time of distribution."

Essentially, *In re Winter,* 114 Cal. 186, 190 [45 P. 1063], and *Estate of Hartson,* 218 Cal. 536, 539-541 [24 P.2d 171], stand for the principles voiced in the Clark case, *supra.* Perusal of them will disclose that emphasis is laid upon the intention of the testator in each instance. While the language of California decisions which are said to be to the contrary is not wholly reconcilable with these cases, the quest for intention of a testator is a common thread which pervades all of them and in a broad sense makes them harmonious. *Estate of Blake,* 157 Cal. 448, 458 [108 P. 287]: "There is no subject

---

[6]It is immaterial that the citation of § 698 of Gray on Perpetuities may not support the statement for which it is cited. The text announced the law of this state.

in the law to which more refinement of learning has been applied, nor one where, particularly in ascertaining whether a remainder is a contingent or vested one, more nice, technical, and shadowy rules of construction have been formulated. . . . They are simply subordinate rules of construction which are applied only in the absence of all other indications in the will to the contrary and in support of an intention on the part of the testator to create a vested remainder.'' This rule of the Clark and similar cases, if accepted as one of constructional preference in aid of effectuating the testator's intent, is undoubtedly sound law. It would be a futile task to attempt to reconcile all our California decisions upon the subject, but reference will be made to several which are said to be opposed to the cases above discussed.

*Estate of Backesto,* 71 Cal.App. 409 [235 P. 670]. Testator left his wife a life estate in all his property and directed that upon her death the property be sold and the proceeds divided equally among children of certain of his brothers and sisters—all except his brother Henry's children who should take half as much as the others. Testator's brother Jacob had a daughter, Irene Seton, who died before testator's wife. Irene's daughter, Sadie Seton Wagner, was excluded from the distribution made by the trial court and she appealed. The ruling was made upon the theory that the gifts did not vest until the death of testator's wife. The appellate court held that a class gift vests at the testator's death and opens as new members come into being though possession is postponed. It assumed this vesting to be determinative of the case and on that basis reversed the judgment; it did not discuss the matter of a defeasance of a vested interest or any implication of survivorship. For these reasons it cannot be considered as controlling at bar.

*Estate of Norris,* 78 Cal.App.2d 152 [177 P.2d 299]. Testatrix had one son, Frederic King, whose wife was Edith Boswell King. They had three children, Boswell F. King, Thomas S. King and William N. King. William died before either of his parents, leaving his wife Margaret W. King surviving him. Testatrix' will set up certain trusts which were to terminate upon the death of both Frederic and his wife Edith. Thereupon, the trustee was to ''grant and deliver'' the trust estate, share and share alike, to the children of Frederic and Edith ''or their legal heirs by right of representation,'' i.e., the legal heirs of said children. The will also provided that any other child born to Frederic and Edith should share in

the trust with the same rights as children previously named. The decree of distribution departed somewhat from this language (see p. 157), providing for delivery of the trust property "unto the children, share and share alike, or their legal heirs by right of representation, of the said" Frederic and Edith. Appellants Boswell F. King and Thomas S. King claimed the entire trust estate on the theory that William N. King's death before termination of the trust ended his interest therein; that survivorship was of the essence of the class gift because the remainders were contingent and not vested (p. 157). Respondent contended that the interests were vested and only possession was postponed. The reviewing court held that the remainders were vested and the fact that the class would open for new members was not inconsistent with that conclusion. The question presented in the instant case was not considered in Norris. Indeed, the terms of the will provided for deceased class members by directing that their shares should go to their legal heirs. The court said, at page 160: "If the decree is fairly clear without resort to rules of constructional preference then, of course, such rules need not be considered. Many times these rules of construction are resorted to as a form of rationalization, that is, to justify a construction already made." At page 161: "The law is well settled that vested remainders can be created in a class the membership of which is not complete at the effective date of the grant or devise, so that similar vested interests accrue to those who, by later entry therein, fall within the class. . . . In such a case the remainders could well be vested in the three children of Frederic and Edith, and, had there been any later entrants into the class (there were not), their interests would have vested as they were born, and by virtue of the consequent increase in the class membership, the vested interests of the preceding members would have been proportionately diminished. It is well settled that the fact that the interests of existing members of the class may be thus diminished does not convert the interest of such members to contingent remainders. In such event the remainders are vested subject to a condition subsequent." The author of the Norris opinion referred to it in *Leonardini* v. *Wells Fargo Bank*, 131 Cal.App.2d 9, 15 [280 P.2d 81, 49 A.L.R.2d 1085], as follows: "The parties seem agreed that the interest of appellant was vested, and base that conclusion on *Estate of Norris*, 78 Cal.App.2d 152 [177 P.2d 299]. Undoubtedly this court held in that case that a decree of distribution

which provided that a gift, after a life estate, to the children 'or their legal heirs by right of representation,' created a vested remainder in the children. The quoted phrase is, of course, equivalent to 'or his heirs' found in the present case. But the court did not hold that in every case the quoted phrase made the remainder a vested one, but held that under all the provisions of the decree of distribution, discussed at length in the opinion, an intent appeared to make the remainder vested. The cases on this subject are in hopeless conflict and seldom, if ever, turn solely upon the words 'or his heirs' or their equivalent. The great majority of them turn upon all of the provisions of the trust, the courts trying to ascertain the intent of the testator. (See anno. 128 A.L.R. 306.)''

Whether a class member's survival of the life tenant is a condition subsequent upon nonoccurrence of which a vested interest is terminated is not answered by a mere holding that that future estate is vested, but turns upon the intention of the testatrix. In this case it appears to be the sound conclusion that survival of the life tenant is a condition subsequent attached to the estate vested in a class member; a total failure of class members to survive the life tenant causes the gift to lapse and fall into the residue. To hold that Walter Hansen had an estate which could be alienated and which would survive the life tenant after his own death opens the way for injecting into the class strangers to the blood, people whom the testatrix had no possible intention of benefiting. There is no evidence of substantiality tending to establish an affirmative or any intention of testatrix that anyone other than Walter L. Hansen or the University should enjoy the benefit of the remainder of the Hansen trust.

The trial court properly held that Walter L. Hansen had no estate which he could will to Mrs. Barton, and that his interest in the trust lapsed upon his death. That the ruling may have been based upon the faulty view that Walter had only a contingent estate, in the sense of one subject to a condition precedent, does not affect the soundness of the decision.

Appellant Barton contends that the determination of this law question has been concluded by the ruling in an early proceeding to which the University was a party. As above shown, testatrix created a trust for her niece, Jennie L. Lawton, in the same language as that used in the case of Amy L. Hansen. Mrs. Lawton had one son who survived testatrix

160

but died without issue leaving all his estate to his mother. She died shortly thereafter and her executor applied for distribution to her estate of the son's interest in the Stanford trust estate. The University contested but the court made the order as requested. This was in 1927. The University appealed to this court. Later the appeal was dismissed pursuant to stipulation. The present claim cannot be sustained for several reasons.

There was no plea of res judicata in the trial court and the case was not tried upon the theory of the existence of such an issue. Counsel's argument here is based upon *Southern Pac. Co.* v. *City of Los Angeles,* 5 Cal.2d 545, 548 [55 P.2d 847], a case which does not consider res judicata. Indeed, counsel's contention is that conflicting decisions with respect to the two trusts "creates an anomalous situation in a case wherein diametrically opposite conclusions are reached as to the legal effect of the same essential facts, similarly presented, but applied to different individuals." The cited case was one of two lawsuits which this court brought together for contemporaneous disposition in order to avoid divergent results flowing from identical facts and law questions. That precedent was strictly limited in *Dillard* v. *McKnight,* 34 Cal.2d 209, 224 [209 P.2d 387, 11 A.L.R.2d 835], to situations where both judgments are before the court and the essential facts in each case are similarly presented and in most particulars undisputed.

The dismissal of the University's appeal from the Lawton ruling was based upon a stipulation and was made without any inquiry by this court into the merits of the case. Hence it affords no basis for a plea of res judicata. Under such circumstances it is "an affirmance of the judgment only in a limited sense. . . . At the most, the dismissal prevents a second appeal, and relieves the order or judgment from attack for error or irregularity which could have been taken advantage of upon appeal." (*Sullivan* v. *Gage,* 145 Cal. 759, 770 [79 P. 537].) To the same effect is *Howard* v. *Howard,* 87 Cal.App. 20, 27 [261 P. 714], which says: "In our opinion a dismissal of an appeal by the supreme court or district court of appeal for the reason that the appeal has not been prosecuted as required by statute and the rules governing appeals operate as an affirmance only to the extent of precluding further appeal and leaves the judgment appealed from unimpaired. No court is permitted to pass upon issues not before it for determination; and when the appel-

late court in its order of dismissal, concludes that there is no question presented to it for hearing, and in effect that the appellate jurisdiction has not been invoked, it would seem difficult to say that this is a solemn judgment, *per se*, determining the questions which the court refuses to consider.'' After a judgment has been affirmed on appeal it is the judgment, not the affirmance, which affords basis for the plea of res judicata. An affirmance merely supplies the quality of finality to the judgment.

The court erred in finding that the respondents, as adopted children of Mrs. Hansen, became members of the class ''child or children'' and take the trust estate as sole surviving members thereof.

Upon this issue expressed testamentary intent controls, not some inflexible rule of substantive law. This is settled by *Estate of Pierce,* 32 Cal.2d 265 [196 P.2d 1], wherein the question was whether the term ''children (lawful issue)'' as used in the will in relation to collateral relatives included or excluded adopted children. In rejecting the contention that the inheritance statute (Prob. Code, § 257) controlled the decision the court said, at pages 268-270: ''Even though an adopted child has a status with respect to its adoptive parent identical to that of a child born of such parent and succeeds to the estate of an adoptive parent in the same manner as a child born of such parent, it does not follow that such status is determinative in construing the terms of a will. It is fundamental in the interpretation of wills that the testator's intent be derived from the language of the will itself and, under Probate Code, section 105, when an uncertainty appears upon the face of the will, from the circumstances under which it was executed. . . . In the determination of the rights of an adopted child under a will, the controlling question is not whether the adopted child would inherit from its adoptive parent under the statute of succession, but whether the adopted child is included among the persons the testator intended to share in his estate. . . . When statutes like section 108 are not applicable, the rules of intestate succession apply only if the testator expresses an intention in the will to adopt such rules.'' It was held that parol evidence was properly received and that the court on that basis correctly adjudged the adopted children to be excluded from the class gift in that instance.

Concerning adopted children the Restatement says in sec-

tion 287 (page 1520): ''(1) When a limitation is in favor of the 'children' of a designated person, all persons adopted by the designated person are excluded from the possible takers thereunder except when a contrary intent of the conveyor is found from additional language or circumstances.''

Comment a at page 1521: ''The rule stated in this Section narrows the group of 'possible takers' under a limitation in favor of the 'children of B' by normally eliminating all children adopted by B. Historically, the word 'children' did not include anyone except issue of the body of the designated parent. No legal method for the adoption of children existed. . . . This historically derived restriction upon the inclusiveness of the term continues, except when a 'contrary intent of the conveyor is found from additional language or circumstances.' This continuance finds justification in the obvious fact that the conveyor normally does not desire the designated parent to have power, by adopting any person he may choose, in effect to appoint the subject matter of the conveyance to such person.''

Comment c, page 1522: ''The situation most commonly within the stated exclusionary rule exists when A executes a conveyance containing a limitation in favor of the 'children of B,' and B adopts a child subsequent to the time when A has lost the power to alter or to eliminate this limitation, as for example, when A, being a testator, has died.''

*Estate of Clark, supra,* 64 Cal.App.2d 636, 643 [149 P.2d 465]: ''Under these decisions, Mrs. Dorstewitz could not have been vested with an 'indefeasible estate,' for the reason that she had died before the termination of the trust. Hence her estate could not pass to her adopted children. Under the rule of those cases the legatee class at Margaret's death included only the surviving, consanguineal posterity of Walter C. Miller. (33 C.J. p. 817; Bouvier.)'' See also 1 Am.Jur. § 64, p. 665; 95 C.J.S. § 653, p. 954; Annos, in 70 A.L.R. 621 and 144 A.L.R. 670.

On the question of Mrs. Stanford's intention it should be recognized first that this class gift does not run to her own children but to those of a collateral relative. One who takes a child into her home through the formal process of adoption looks upon her thenceforth as if she were natural born, confers on her all the rights of a natural child, and assumes toward her all the obligations owed to issue of her own body. When she speaks of her children a natural inference arises that she includes the adopted one. But the situation is dif-

ferent with respect to the adoptee of a collateral relative. With that artificial relationship testatrix has nothing to do; toward that child she has assumed no obligation; when she refers to the children of that relative there is no natural basis for an inference that she has the adopted child in mind. If Mrs. Hansen could bring other relatives, such as Mrs. Reynolds, into the trust through the adoption process, she could include strangers in the same way.

The will was made in 1903, when Mrs. Hansen was 37 years of age and her son Walter 13. She had demonstrated her ability to reproduce and there was no reason to anticipate that there would be any need or occasion for adoption. The record is barren of any evidence that the subject had ever been discussed or that testatrix had any basis for inferring that an adoption would or might take place. It did not occur until 19 years after her death, or until after Walter had attempted to pass his interest to Mrs. Barton, a complete stranger to Mrs. Stanford. The adoptees in this instance were an adult woman and her two minor daughters. Prior to Mrs. Stanford's death California law did not permit the adoption of an adult. (*Estate of Taggart*, 190 Cal. 493, 498 [213 P. 504, 27 A.L.R. 1360].) The law was changed in this respect in 1951. (Civ. Code, § 221; 2 Cal.Jur.2d § 8, p. 422.) If Mrs. Stanford be presumed to know the law,[7] that knowledge could not extend to the statutes of New York, which did permit the adoption of adults and which was invoked by Mrs. Hansen in this instance.

The will being silent on the subject, there is no basis for inferring an intent to include adopted children in the class "child or children" unless it be found in testatrix' letter of 1897 written to Dr. David Starr Jordan, president of the University. This was seven years before the making of her will. Briefly, it explains the circumstances of taking a niece, Jennie L. Lathrop, into her home as a baby and thereafter caring for her at different periods; refers to her husband's opposition thereto and further says: "Some might think it was adoption which we both felt could never be—and we both felt that our heart's best love had been given, never to be replaced by any other love for any but our dear son." Also, "I must be guarded and careful to let the world and the dear child herself know that I had never adopted her. . . . She

---

[7]It is doubtful that there is any such presumption. See *Murphy* v. *Sheftel*, 121 Cal.App. 533, 538 [9 P.2d 568].

knows full well her true position that she has not been adopted by me and never can be. And in all my conversations with her Father and my brother Charles G. Lathrop I have endeavored to impress upon him this fact that I did not look upon dear Jennie as my child.'' The trial judge found on the basis of this letter that ''prior to execution of her said will, said decedent understood fully and clearly that the effect of adoption was to put the child adopted on the same footing as a natural child; in using the term 'child or children' of Aimee L. Hanson, said decedent intended to include and did include therein any child or children lawfully adopted by Aimee L. Hanson.'' The letter warrants no such inferences. The most that can be inferred therefrom is that Mrs. Stanford understood that one who claimed to be her adopted daughter *might* be treated as a pretermitted heir and take a child's share in her estate in the absence of provision for her in her will. That she also thought that an adopted child of a niece would be entitled to any part of her own estate or that her silence on the subject would bring that child into her class gift is sheer speculation, a mere possibility and no more. Possibilities cannot afford legal basis for an inference of fact. (*Robinson* v. *Board of Retirement*, 140 Cal.App.2d 115, 118 [294 P.2d 724] ; 18 Cal.Jur.2d § 60, p. 479.) Of course, when the trier of facts attempts to build inference upon inference, the first or basic one must be permissible or the whole structure collapses. (18 Cal.Jur.2d § 61, p. 481;*Vaccarezza* v. *Sanguinetti,* 71 Cal.App.2d 687, 698 [163 P.2d 470].) Fundamentally this communication is opposed to the claims of adopted children to share in an estate when not specifically included in a will. The letter under discussion says: ''I make this explicit explanation in this letter to you that you may hold it sacred and if after my eyes are closed to life here, hands are folded and my work finished the subject would be discussed whether or not Jennie L. Lathrop had been adopted, you can use this letter and defend me.'' As a matter of law this letter affords no basis for the inferences drawn by the trial judge and furnishes no support to the claims of respondents. This is not a case of a finding based upon conflicting substantial evidence, but one of absence of any competent evidence to support the finding. The record affords no legal basis for the conclusion that the adoptees, respondents herein, became members of the class ''child or children'' of Amy L. Hansen, or that they are entitled to any portion of Mrs. Stanford's estate.

Respondents present the alternative argument that, assuming the foregoing ruling to be correct, "a gift over then arises by implication to the surviving issue of Daniel Lathrop in equal shares per stirpes." They identify Mrs. Reynolds as such, she being the last surviving grandchild of Daniel Lathrop.

Counsel rely upon such cases as *Brock* v. *Hall*, 33 Cal.2d 885 [206 P.2d 360, 11 A.L.R.2d 672], which states the doctrine as follows: "The implication of gifts in wills rests upon the primary rule of construction that the duty of the court in all cases of interpretation is to ascertain the intention of the maker from the instrument read as a whole and to give effect thereto if possible, and it is well settled that, where the intention to make a gift clearly appears in a will, although perhaps imperfectly expressed, the court will raise a gift by implication. [P. 887.] . . . When the intention to make a gift clearly appears from the instrument taken by its four corners and read as a whole, considering its general scheme, the property involved, and the persons named as beneficiaries, the gift may be implied. (*Estate of Franck,* 190 Cal. 28, 31 [210 P. 417].) Although the court may not indulge in conjecture or speculation simply because the instrument seems to have omitted something which it is reasonable to suppose should have been provided, a gift will be raised by necessary implication where a reading of the entire instrument produces a conviction that a gift was intended. [P. 889.] . . . Accordingly, in ascertaining the intention of the trustor the court is not limited to determining what is meant by any particular phrase but may also consider the necessary implication arising from the language of the instrument as a whole." [P. 890.]

Mrs. Reynolds was given outright a share of Ariel's trust (above described) upon his death, some $81,250, and has received her share of the corpus and accumulated income of the trust created by subdivision d of part I of the will, the sum of $325,000; a grand total of $406,250. Subdivision d contains gifts over, while the one creating Amy Hansen's trust (immediately preceding d) stops short of that and certainly does not imply a gift over in favor of Mrs. Reynolds with respect to the Hansen trust. The discussion of Mrs. Stanford's intention concerning adopted children, *supra,* views the will "taken by its four corners and read as a whole, considering its general scheme, the property involved, and the persons named as beneficiaries" (quoting *Brock* v. *Hall, supra,* p. 889), and establishes without necessity of repetition

or further elaboration that Mrs. Stanford had no intention to give the remainder of the Hansen trust to Mrs. Reynolds in preference and to the exclusion of the University. The implied gift argument cannot prevail.

The judgment should be affirmed as to that portion which decrees that appellant Barton is not entitled to take, but should be reversed in other respects with instructions to enter judgment distributing to the Board of Trustees of the Leland Stanford Junior University the entire trust estate created by subdivision c of section I of the will of testatrix.

Shenk, J., and McComb, J., concurred.

The petition of appellant Board of Trustees of The Leland Stanford Junior University for a rehearing was denied October 16, 1957. Ashburn, J. pro tem.,* participated therein in place of Spence, J. Shenk, J., McComb, J., and Ashburn, J. pro tem.,* were of the opinion that the petition should be granted.

*Assigned by Chairman of Judicial Council.